# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Thomas Lissick, | Civil No. 18-2857 (DWF/KMM) |
| Plaintiff, | |
| v. | **MEMORANDUM** |
| | **OPINION AND ORDER** |
| Andersen Corporation, | |
| Defendant. | |

---

Jeffrey D. Schiek, Esq., and Philip G. Villaume, Esq., Villaume & Schiek, P.A., counsel for Plaintiff.

Ben Mulligan, Esq., and David M. Wilk, Esq., Larson King, LLP, counsel for Defendant.

---

## INTRODUCTION

This matter is before the Court on Defendant Andersen Corporation's ("Andersen") Motion for Summary Judgment.  (Doc. No. 17.)  For the reasons set forth below, the Court grants Andersen's motion.

## BACKGROUND

Andersen manufactures windows and doors for the residential housing market. (Doc. No. 49 ("Weyer Decl.") ¶ 2.)  Plaintiff Thomas Lissick ("Lissick") was responsible for maintaining and repairing equipment at one of Andersen's manufacturing facilities from January 17, 2000 to January 11, 2018 when he was terminated.  (Weyer Decl. ¶ 4; Doc. No. 50 ("Smutny Decl.") ¶¶ 2, 5.).  Lissick contends that his termination was unlawful.  (Doc. No. 52 ("Lissick Opp.") at 1.)  Andersen argues that it terminated

Lissick for repeated failure to comply with required safety protocol. (Doc. No. 19 ("Andersen Memo.") at 2.)

Specifically, Andersen contends that Lissick violated its lockout/tagout ("LOTO") procedure on three separate occasions.[1] (Andersen Memo. at 1.) The LOTO procedure requires an employee to disable power to and discharge all energy sources from a machine and to lock it in the "off" position before performing maintenance or repair work. (Weyer Decl. ¶¶ 3-4.) Andersen's Safety Rules and Regulations Enforcement Guidelines recommends termination after a second LOTO procedure violation. (Wilk Aff. ¶ 29, Doc. No. 47, Ex. 28 at 4-8 ("Enforcement Guidelines").) Lissick received LOTO training immediately after he was hired and received additional training annually. (Wilk Aff. ¶ 7, Ex. 6 ("Lissick Dep.") at 60-61.)

Lissick's third alleged LOTO violation occurred on January 3, 2018. (Doc. No. 53 ("Schiek Aff.") ¶ 12, Doc. No. 59, Ex. I ("LOTO Incident 3") at 1.) On that occasion, Lissick was working on Reciprocator 9. (*Id.*) Reciprocator 9 is a large machine designed to move materials from one floor to another. (Weyer Decl. ¶ 6.) Specifically, second floor conveyors carry pallets of materials into an elevator which then lowers the materials to the first floor. (*Id.*) Conveyors on the first floor carry the materials out of the elevator so they can be moved to a shipping area. (*Id.*) A control room on the first floor houses

---

[1] The first violation occurred in June 2011. (Doc. No. 20 ("Wilk Aff.") ¶ 9, Doc. No. 20-1, Ex. 8 at 88.) Lissick was suspended for three days and advised that additional violations could result in termination of his employment. (*Id.*) The second violation occurred in September 2017. (Wilk Aff. ¶ 20, Doc. No. 39, Ex. 19 at 2.) Lissick was again suspended for three days and advised that additional violations could result in termination of his employment. (*Id.*)

the master power for Reciprocator 9, which controls the electrical power to the conveyors and the elevator. (*Id.* ¶ 8.)

Reciprocator 9 also has pedestal-mounted control panels on each floor. (*Id.* ¶ 7.) Each control panel has an emergency stop button ("E-Stop") as well as an on-off switch. (*Id.*) To lock out the conveyors from the pedestal, an operator turns off the power switch and locks the switch in the off position with a padlock. (Wilk Aff. ¶ 23, Ex. 22 ("Hartwick Dep.") at 37.) Andersen alleges that this method of locking out the conveyors is appropriate for employees who are clearing debris or adjusting material on the conveyor. (Weyer Decl. ¶ 7.)

For any purpose other than clearing blocked or misaligned material on a conveyor, Andersen alleges that maintenance employees are required to remove or disable all power sources to the reciprocator before performing assessment, maintenance, or repair work. (*Id.* ¶ 8; Hartwick Dep. at 45.) To fully disable Reciprocator 9, employees must lower the elevator to the first floor, shut off the master electrical power switch in the control room on the first floor, and lock the main power switch in the off position in accordance with the instructions posted at Reciprocator 9. (*Id.* ¶ 8; Wilk Aff. ¶ 27, Doc. No. 45, Ex. 26 ("Investigation Memo.") at 19-21.)

On January 3, another Andersen employee, Brian Burns ("Burns"), observed Lissick working on Reciprocator 9's second floor conveyor. (Wilk Aff. ¶ 25, Ex. 24 ("Burns Dep.") at 24-25.) It did not appear to Burns that Reciprocator 9 was properly locked out. (*Id.*) Burns asked Lissick whether the machine should be locked out. (*Id.* at 25.) According to Burns, Lissick told him that "he'd get it later." (*Id.* at 25, 27.) Burns

then noticed that his supervisor, Jim Hartwick ("Hartwick"), was standing behind him. (*Id.* at 27.)  Burns gestured towards the area where Lissick was working to indicate that Lissick was not properly locked out.  (*Id.* at 27.)

Hartwick observed that the reciprocator's elevator car was on the second floor and that there was a red light on the control panel.  (*Id.* at 26-27, 46, 53.)  This meant that the master electrical power switch in the first-floor control room had not been locked out. (*Id.* at 26-27.)  Hartwick asked Lissick whether he was locked out.  (*Id.* at 23-24, 26-27.) According to Hartwick, Lissick "just stood up and went downstairs."  (*Id.* at 26-27.) Hartwick assumed that Lissick went downstairs to lock out the machine.  (*Id.*)

The following morning, Hartwick reported the incident to Lissick's supervisor, Tom Fitzmorris.  (*Id.* at 31-32; Wilk Aff. ¶ 26, Ex. 25 ("Hartwick Email").)  Hartwick reported that Lissick was working on Reciprocator 9 without being properly locked out. (Hartwick Email.)  Fitzmorris forwarded the Hartwick Email to his manager, Chris Weyer ("Weyer").  (*Id.*)  After receiving the Hartwick Email, Weyer learned that Lissick had been disciplined for other LOTO violations.  (Weyer Decl. ¶ 9.)  Weyer forwarded the email to his human resources generalist, Monique Romane ("Romane").  (Weyer Decl. ¶ 10, Ex. A ("LOTO Incident Email").)  Weyer informed Romane that Lissick "was recently disciplined for a similar incident within the last few months," and that they needed to "determine next steps for Mr. Lissick."  (LOTO Incident Email.)

Weyer met with Romane later that day.  (Weyer Decl. ¶ 12.)  He explained his concern that Lissick was accused of a third LOTO violation after having recently been suspended for violating the LOTO procedure.  (*Id.*)  Weyer provided Romane with a copy

of the Enforcement Guidelines and pointed out that the Enforcement Guidelines do not include a suggested level of discipline for a third LOTO violation because termination is recommended after two LOTO violations. (*Id.*) Weyer asked Romane to investigate the matter and to determine whether Lissick violated the LOTO procedure on January 3. (*Id.* ¶ 13.) Weyer stated that he was not aware of anyone other than Lissick who was not terminated after a second LOTO violation. (*Id.* ¶ 12.) Weyer advised that if Romane found that Lissick did violate the LOTO procedure on January 3, he would recommend terminating Lissick's employment. (*Id.*) Weyer stated that this recommendation was based on the Enforcement Guidelines, and his experience. (*Id.* ¶12)

Romane investigated the alleged violation between January 4 and 9, 2018. (Wilks Aff. ¶ 24, Ex. 23 ("Romane Dep.") at 13; Investigation Memo. at 2.) Romane spoke with Burns, Hartwick, Lissick, and AMS and Safety Manager, Bonnie Christensen ("Christensen"). (Investigation Memo. at 2.) Burns and Hartwick recounted their descriptions of what occurred. (*Id.* at 4-6.)

According to the Investigation Memo., Lissick told Romane that he remembered hitting the E-Stop and believed that he had locked out properly because he was only "evaluating the reciprocator" as opposed to performing work on it. (*Id.* at 9.) He explained that his evaluation included "pushing wheels" to determine what was wrong, and that once he determined the issue, he went downstairs and locked out the machine. (*Id.* at 9-10.) Lissick also told Romane that the LOTO information posted on Reciprocator 9 was confusing, and that he had reported to a "a female on the safety team" that the written procedures on the machines don't always align with the signs that are

hung in the area.  (*Id.* at 10.)  He also stated that his evaluation took place "on the other side of the signs that indicate that LOTO was needed."  (*Id.* at 10.)

Romane followed up with Christensen, Weyer, and Fitzmorris regarding potential confusion with the LOTO procedures.  (*Id.* at 7-8.)  Christensen stated that while there was work being done to update the look and feel of the posted LOTO procedures, she believed that employees should be able to follow the procedures as posted without issues.  (*Id.* at 7.)  Christensen specifically reviewed the LOTO procedures for Reciprocator 9, concluded that they were clear, and stated her belief that someone reading the procedure would know the necessary steps to comply with the LOTO protocol.  (*Id.*)  Christensen also stated that there was no specific record of Lissick having submitted any safety concerns around LOTO procedures, however, she did state that one of her employees had mentioned to her that someone chatted with her in passing regarding LOTO about six weeks prior, but nothing specific to updates or concerns.  (*Id.*)  Weyer and Fitzmorris also shared that they had not received any safety concerns regarding LOTO procedures or confusing signs.  (*Id.* at 8.)

At the conclusion of her investigation, Romane determined that Lissick violated the LOTO procedure because he performed work on the machine without properly locking out.  (Romane Dep. at 67-69.)  She found that Lissick admitted as much when he stated that he was working on the machine after hitting the E-Stop button.  (*Id.* at 68.)  Romane and Fitzmorris subsequently informed Lissick that he was suspended for five days while termination was considered.  (Romane Dep. at 81-82; LOTO Incident 3.)  They presented Lissick with an Unusual Incident Report concerning the suspension.

(LOTO Incident 3.)  Lissick signed the report and wrote in the employee comment section that he was "evaluating machine—did not lock out—E-stop.  But locks on when working on chain replacement."  (*Id.*)

On January 9, 2018, Romane sent an email to Fitzmorris, Weyer, and Weyer's supervisor, Dan Hinrichs ("Hinrichs"), with her finding that Lissick's failure to properly lock out Reciprocator 9 put both Lissick and others at risk for injury, and that she supported Weyer's recommendation for termination.  (Wilk. Aff. ¶ 30, Ex. 29 ("Termination Email") at 1.)  Fitzmorris responded to the Termination Email by thanking Romane for the update.  (*Id.*)  Romane replied to Fitzmorris and specifically asked whether he was supportive in moving forward with the intent to terminate.  (*Id.*)  Fitzmorris responded that he was in support of termination.  (*Id.*)  Termination paperwork was then signed by Fitzmorris, Romane, Romane's supervisor Missy Smutny ("Smutny"), Weyer, Hinrichs, and Vice President Jim Moulton ("Moulton").  (Wilk. Aff. ¶ 29, Doc. No. 47, Ex. 28 (Termination Rec.") at 3.)  Lissick was terminated on January 11, 2018.  (Smutny Decl. ¶ 2.)

Lissick contends that his termination was illegal.  (Lissick Opp. at 1.) Specifically, he contends that his termination was:  (1) retaliation for reporting violations of laws or regulations or rules in violation of Minn. Stat. § 181.932, subd. 1(1); (2) sexual discrimination and retaliation for reporting sexual harassment in violation of Minn. Stat. § 363A.08; (3) discrimination for taking leave under the Family Medical Leave Act ("FMLA") pursuant to 29 U.S.C. § 2615(a)(2); and (4) age discrimination in violation of

Minn. Stat. § 181.81.[2]  (*Id.*; *see also* Doc. No. 1-1 ("Compl.") ¶¶ 101-111, 143-173, 207-217.)

### 1.    Whistleblowing and Sexual Harassment

On September 6, 2017, Lissick reported to upper management that employees in his department were texting nude pictures of women, and that they were referring to Lissick as "Lipstick."[3]  (Schiek Aff. ¶ 18, Ex. O ("Carmichael Dep.") at 27-30.) Carmichael asked his human resources generalist, Raymond Ronayne ("Ronayne") to investigate Lissick's allegations.  (Wilk Aff. ¶ 13, Ex. 12 ("Ronayne Dep.") at 18.) Ronayne spoke to several of Lissick's colleagues who confirmed that they had received inappropriate texts.  (*Id.* at 25; Wilk Aff. ¶ 15, Doc. No. 33, Ex. 14 ("Ronayne Investigation").)  One colleague also admitted to referring to Lissick as "Lipstick." (Ronayne Investigation at 4.)  This person was issued a written warning and advised that similar behavior may lead to termination.  (Wilk Aff. ¶ 17, Doc. No. 35, Ex. 16.) Andersen also determined that the inappropriate texts had been sent from an outside vendor's employee.  (Carmichael Dep. at 33.)  Andersen told the vendor not to send the person back to Andersen.  (*Id.*)

On September 13, 2017, Lissick reported to Ronayne that two employees were falsifying documents related to eye wash stations.  (Ronayne Dep. at 26-30.)  The

---

[2]    Only four of Lissick's original eight counts remain.  (Wilk Aff.  ¶ 31, Ex. 30.) Lissick agreed to dismiss four counts after discovery.  (*Id.*)

[3]    Lissick reported to Bradley Carmichael ("Carmichael"), Fitzmorris' manager at the time.  (Carmichael Dep. at 17.)  Lissick asserts that he went to Carmichael because he felt that Fitzmorris was enabling offensive behavior.  (Ronayne Investigation at 2.)

employees who admitted to falsifying the documents were suspended for three days without pay.  (*Id.* at 27-28; Schiek Aff. ¶ 9, Doc. No. 56, Ex. F ("Eye Wash Incident").) One of the employees also accused Lissick of forging eye wash documentation; however, Fitzmorris investigated and could not conclude that Lissick forged the documents.  (Wilk Aff. ¶ 12, Ex. 11 ("Fitzmorris Dep.") at 44-45.)  Fitzmorris took Lissick at this word that Lissick had not forged anything and did not pursue the matter further.  (*Id.*)

On October 5, 2017, the same employee who had been disciplined for referring to Lissick as "Lipstick," attempted to send an email to Fitzmorris about Lissick with the subject line "lone wolf."  (Wilk Aff. ¶ 22, Doc. No. 41, Ex. 21 ("Lone Wolf Incident").) The employee inadvertently sent the email to Lissick instead.  (*Id.*)  Lissick was offended by the email and reported it to Fitzmorris and Carmichael.  (Lissick Dep. at 272-73.)  On October 10, 2017, Fitzmorris issued the offending employee a final disciplinary warning because he had again referred to Lissick by an offensive nickname.  (Lone Wolf Incident.)  On October 17, 2017, Fitzmorris held a meeting with his team to discuss how to move forward and to improve morale after the texting and name-calling incidents.[4] (Fitzmorris Dep. at 62-63.)

---

[4] In his complaint, Lissick alleged that he also reported a 2015 threat from his co-workers that they were going to make Lissick's day "the worst day of his life."  (Compl. ¶ 13.)  While Andersen addresses the threat in its memorandum, Lissick does not address it.  (*See* Andersen Memo.; Lissick Opp.)  The Court mentions the 2015 allegation for the sake of completeness; however, it does not alter the Court's analysis.

## 2. FMLA

In April 2017, Lissick requested intermittent FMLA leave to assist his sick father with medical appointments. (Fitzmorris Dep. at 110-11; Smutny Decl. ¶ 6.) Fitzmorris helped to connect Lissick with a third-party vendor that handles Andersen's FMLA requests and approvals.[5] (Fitzmorris Dep. at 110-111.) Lissick's FMLA request was approved through August 2018. (Smutny Decl. ¶ 6.) Lissick took time off in August, September, and October 2017. (*Id.*) Fitzmorris was Lissick's supervisor during the period Lissick exercised his leave. (*See id.*)

## 3. Age

Lissick contends that Andersen has a statutory duty pursuant to Minn. Stat. § 181.81 to post a sign that the mandatory age for retirement is 70 years old. (Lissick Opp. at 27.) The record reflects that Andersen does not have such a sign.[6] (Schiek Aff. ¶ 13, Doc. No. 60, Ex. J at 19.) The record also reflects that Andersen does not have a mandatory retirement age. (Doc. No. 67 ("Smutny Decl. 2") ¶ 2.)

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[5] Fitzmorris began supervising Lissick in 2016 and remained his supervisor during all relevant times.

[6] Even if Andersen had a statutory duty to post the sign, the record does not reflect how Lissick was personally damaged by the failure to post.

Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.  *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

### 1.      Retaliation for Violations of the Minnesota Whistleblower Act

The Minnesota Whistleblower Act ("MWA") prohibits an employer from discharging an employee because the employee, "in good faith, reports a violation [or] suspected violation . . . of any federal or state law or common law[.]"  Minn. Stat. § 181.932, subd. 1(1).  An MWA claim is analyzed under the three-part *McDonnell Douglas* burden shifting test.  *Grundtner v. Univ. of Minn.*, 730 N.W.2d 323, 329 (Minn. App. 2007) (citing *Cokley v. City of Otseego*, 623 N.W.2d 625, 630 (Minn. App. 2001);

*see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-806 (1973).  First, Lissick must establish a prima facie case of retaliatory action.  *Id.*  The burden then shifts to Andersen to articulate a legitimate, non-retaliatory reason for Lissick's termination. *Id.*  Finally, Lissick must show that Andersen's proffered reason is a pretext for unlawful retaliation.  *Id.*

To make a *prima facie* showing, Lissick must establish that:  (1) he engaged in protected activity; (2) Andersen subjected him to an adverse-employment action; and (3) there is a causal link between the protected conduct and the adverse-employment action. *Cokley*, 623 N.W.2d at 630.

Andersen argues that Lissick's MWA claim fails because he cannot show a causal connection between any alleged protected activity and the termination of his employment.  (Andersen Memo. at 20.)  Specifically, Andersen contends that there is no evidence that Lissick's September 2017 report regarding eye wash stations caused Andersen to terminate his employment more than three months later.  (*Id.*)  Andersen also maintains that there is no evidence that Andersen was dissatisfied with Lissick's report because it immediately investigated and issued written discipline notices and suspensions to the employees who admitted to forging the documents.  (*Id.* at 21.)  Andersen further contends that Fitzmorris would not have taken Lissick at his word if Fitzmorris was looking for an opportunity to retaliate against Lissick when Lissick was also accused of falsifying eye wash documents.  (*Id.*)  Finally, Andersen argues that neither Romane nor

Weyer knew about Lissick's eye wash station report when they decided to terminate his employment.[7]  (*Id.* (citing Romane Dep. at 104, 106; Weyer Decl. ¶ 15.)

Lissick places strong emphasis on the timing between his report[s] and his termination.[8]  (Lissick Opp. at 36-37.)  He contends that the timing, combined with other evidence of retaliatory motive is sufficient to support a *prima facie* case of retaliation.  (*Id.* at 36.)  Lissick maintains that Fitzmorris knew that Lissick was being harassed, and that he enabled the harassment by doing little to stop it from happening.  (*Id.*)  Lissick argues that there is "an abundance of direct and circumstantial evidence" that Fitzmorris knew about Lissick's reports and FMLA requests, and that he specifically made the recommendation to terminate Lissick.  (*Id.* at 31.)  Accordingly, Lissick asserts a theory

---

[7]     Andersen also contends that there is no evidence to suggest that Smutny, Hinrichs, or Moulton, who also supported terminating Lissick, knew about the eye wash station report.  (Andersen Memo. at 21 (citing Smutny Decl. ¶ 8; Lissick Dep. at 230, 260-61.)

[8]     Andersen addresses only the 2017 eye wash report in its opposition to the MWA claim.  (*See* Andersen Memo.)  Lissick contends that his MWA claim also encompasses his sexual harassment reports.  (Lissick Opp. at 35 ("It is clear that the Complaints filed in September constituted protected conduct because Lissick was reporting violations of sexual harassment laws and OSHA requirements and fraud violations or suspected violations.").)  Andersen alleges that any claim for reporting sexual harassment is preempted by the Minnesota Human Rights Act ("MHRA") pursuant to Minn. Stat. § 363A.08.  (Doc. No. 65 ("Reply") at 6 (citing *Williams v. St. Paul Ramsey Med. Ctr.*, 551 N.W.2d 483, 48-86 (Minn. 1996)).)  The Court finds that Lissick's MWA claim fails regardless of whether it includes his sexual harassment reports.  For reasons similar to those stated above, the Court finds that there is insufficient evidence to support a causal link between Lissick's sexual harassment reports and his termination.  As discussed *infra*, even if Lissick could establish a *prima facie* case, the Court finds that his MWA claim fails because Andersen had a legitimate non-discriminatory reason to terminate Lissick because of his LOTO violation.

of "cat's paw" liability to argue that Fitzmorris made the recommendation to terminate Lissick, which was only "rubber stamped by upper management."  (*Id.*) He contends that a timeframe of three months provides sufficient evidence of causation to satisfy a prima facie case of retaliation.[9]  (Lissick Opp. at 35.)

Viewing the evidence in the light most favorable to Lissick, the Court concludes that Lissick has not pointed to sufficient evidence that reasonably supports a causal link between any report and his termination.  While Lissick argues that a time frame of three months provides sufficient evidence of causation to satisfy a prima facie case of retaliation, timing alone is rarely sufficient to show causation. *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (a "mere coincidence of timing can rarely be sufficient" to establish causation"); *see also Green v. Franklin Natl. Bank. of Minneapolis*, 459 F.3d 903, 915 (8th Cir. 2006) ("termination shortly after protected activity is not enough").

Moreover, despite Lissick's assertion that Fitzmorris had a retaliatory motive to terminate Lissick, and that Andersen is culpable under a theory of cat's paw liability, the Court finds that there is insufficient evidence to support such a theory.  Not only did Fitzmorris take Lissick at his word when Lissick told him that he did not intentionally falsify eye wash documents, but Fitzmorris did not recommend termination after

---

[9]    "This circuit's cat's paw rule provides that an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design." *Qamhiyah v. Iowa State Univ.*, 566 F.3d 733, 742 (8th Cir. 2009).

Lissick's second LOTO violation that occurred in the same month that Lissick made his report. The record also reflects that Fitzmorris attempted to improve morale by holding a meeting to discuss how to move forward after the reports. Further, there is simply no evidence that Romane, Weyer, or anyone other than Fitzmorris who signed off on his Lissick's termination, knew about Lissick's reports. Accordingly, the Court finds that Lissick fails to establish a *prima facie* case of retaliation under the MWA.

Even if Lissick could establish a *prima facie* case, he nevertheless fails to demonstrate that Andersen's proffered reason for his termination was pretext for unlawful retaliation. "When an employer articulates a non-discriminatory reason for an employee's discharge . . . the factual inquiry proceeds to a new level of specificity." *Dammen v. UniMed Med. Ctr.*, 236 F.3d 978, 981 (8th Cir. 2001) (internal quotation marks and citation marks omitted).

Here, Andersen alleges that it terminated Lissick because he violated its LOTO procedure. The Eighth Circuit has "consistently held that violating a company policy is a legitimate, non-discriminatory rational for terminating an employee." *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006). The Court finds sufficient evidence that Andersen has LOTO policies and procedures, provides training on those policies and procedures, and has specific Enforcement Guidelines to address LOTO violations. The record reflects that the Enforcement Guidelines recommend termination after a second violation.

Lissick contends that Andersen's reason is pretextual because: (1) Lissick had 18 years of service and knows the proper LOTO procedures for Reciprocator 9; (2) the

timing involved is extremely suspect based on the protected conduct and the adverse

actions; (3) Lissick did not violate the LOTO procedure on Reciprocator 9; (4) Andersen

shifted its reasons for terminating Lissick; (5) Romane's investigation was unfounded

and not credible because she had no training or knowledge on how to properly LOTO

Reciprocator 9 ; (6) there was no independent investigation into the matter; (7) "virtually

all the employees" disliked Lissick because they knew that he filed reports against them;

and (8) Lissick has always denied that he did not properly LOTO Reciprocator 9 on

January 3, 2018.  (Lissick Opp. at 40-41.)

    The record reflects that Andersen terminated Lissick after a thorough investigation

and reasonably believed that Lissick violated its LOTO procedures a third time.[10]

Whether or not Lissick actually violated the LOTO procedure when he was working on

Reciprocator 9 does not alter Court's analysis.[11]  "In determining whether a plaintiff has

produced sufficient evidence of pretext, the key question is not whether the stated basis

for termination actually occurred, but whether the defendant believed it to have

occurred."  *Soto v. Core-Mark Int'l, Inc.*, 521 F.3d 837, 841-2 (8th Cir. 2008.)  Here,

Hartwick reported a suspected violation.  Romane investigated the alleged violation and

reasonably concluded that the allegation was credible after a multi-day investigation.[12]

---

[10]    The length of Lissick's employment at Andersen does not alter the fact that he was
suspended for violating LOTO procedures on two separate occasions prior to the alleged
incident.

[11]    Notwithstanding, the Court finds sufficient evidence to support such a conclusion.

[12]    The Court finds that whether or not Romane personally knew how to properly
LOTO Reciprocator 9 did not impact her investigation.  The record reflects a thorough

The record reflects that neither Hartwick nor Romane was aware that Lissick had previously reported illegal activity. *Kunferman v. Ford Motor Co.*, 112 F.3d 962, 965 (8th Cir. 1997) ("An employee must establish the employer's knowledge of protected activity.").

There is insufficient evidence to support Lissick's theory of cat's paw liability, or that Fitzmorris was anything more than a first level supervisor who signed off on a recommendation for termination made by a party unaware of any protected activity. While it is true that Lissick was terminated three months after making his reports, "timing alone is insufficient to show a pretextual motive rebutting a legitimate, non- discriminatory reason for an adverse employment action." *Green*, 459, F.3d at 916. Even viewing the evidence in the light most favorable to Lissick, the Court finds that Andersen terminated Lissick for a legitimate, nondiscriminatory reason. Finding no genuine issue of material fact, the Court concludes that Andersen is entitled to judgment as a matter of law on Lissick's MWA claim.

Because the Court finds that Andersen terminated Lissick's employment for a legitimate, nondiscriminatory reason, Lissick's sexual harassment and FMLA retaliation claims also fail.[13] Notwithstanding, the Court briefly addresses Lissick's remaining claims.

---

and objective investigation based on Romane's training and education as a human resource professional. (Romane Dep. at 6,8.) While Lissick may disagree with Romane's conclusion, there is insufficient evidence to suggest that her conclusion was retaliatory, or that an "independent investigation" was necessary.

[13]    As discussed *infra,* Lissick's age discrimination claim also fails.

## 2.     Sexual Discrimination and Retaliation/Reprisal under the MHRA

Lissick alleges sexual discrimination and reprisal in violation of the MHRA. (Lissick Opp. at 48-49.)  He also alleges that the sexual harassment created a hostile work environment.[14]  (*Id.*)  "When interpreting cases under the MHRA, Minnesota Courts give weight to the federal court interpretations of Title VII claims because of the substantial similarities between the statutes."  *Hunter v. United Parcel Serv., Inc.*, 697 F.3d 697, 702 (8th Cir. 2012) (citing *Wayne v. MasterShield, Inc.*, 597 N.W.2d 917, 921 (Minn. Ct. App. 1999).  The Minnesota Supreme Court has also adopted the *McDonnell Douglas* burden-shifting test to analyze MHRA claims where, as here, a claim is based on circumstantial evidence.  *Id.*

Title VII forbids an employer from "discriminat[ing] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Likewise, the MHRA prohibits an employer from "intentionally engag[ing] in any reprisal against any person because that person . . . opposed a practice forbidden under this chapter or has filed a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  Minn. Stat. Ann. § 363A.15(1).  A reprisal includes, but is not limited to, any form of intimidation, retaliation, or harassment.  *Id.*

---

[14]     Andersen contends that Lissick's claims under the MHRA are barred by the statute of limitations.  (Reply at 11.)

Lissick alleges that his termination was retaliation for the sexual harassment reports he made in 2017.  (Lissick Opp. at 48-49.)  To make a *prima facie* showing of retaliation, Lissick must establish that:  (1) he engaged in protected conduct; (2) a reasonable employee would have found the retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct.  *Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 823 (8th Cir. 2017).

Andersen contends that Lissick cannot establish a *prima facie* case of retaliation because there is no evidence of a causal connection between his sexual harassment reports and his termination.  The Court agrees.  "Causation can be proven 'by evidence of circumstances that justify an interference of retaliatory motive, such as a showing that the employer has actual or imputed knowledge of the protected activity and the adverse employment action follows closely in time."  *Liles*, 851 F.3d at 819 (quoting *Dietrich v. Canadian Pac Ltd.*, 536 N.W.2d 319, 327 (Minn. 1995)).  Here, not only did Lissick's second LOTO violation break a causal link between his sexual harassment reports and his ultimate termination, but the individuals responsible for initiating and conducting the investigation that led to his termination were unaware of his sexual harassment reports.  Furthermore, Lissick was terminated nearly four months after he made the reports.  As discussed *supra*, the Court also finds insufficient evidence to support a theory of cat's paw liability.  Accordingly, the Court finds that Lissick fails to establish a *prima facie* claim of retaliation under the MHRA.

Lissick also alleges that the sexual harassment created a hostile work environment.  (Lissick Opp. at 48-49.)  "Hostile work environment harassment occurs when the

workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Liles*, 851 F.3d at 823 (quoting *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 805 (8th Cir. 2013). To make a *prima facie* showing of a hostile work environment, Lissick must establish: (1) that he was a member of a protected group; (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and his membership in the protected group; (4) that the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt and effective remedial action. *Id.* at 823.

Andersen argues that Lissick's claim fails because Lissick did not experience severe or pervasive sexual harassment, he only heard about the sexually explicit texts but did not receive any personally, and Andersen investigated and addressed Lissick's complaints. (Reply at 12-13.) The Court agrees.

"The standard for demonstrating a hostile work environment under Title VII is 'demanding,' and 'does not prohibit all verbal or physical harassment and it is not a general civility code for the American workplace.'" *Liles*, 851 F.3d at 823 (quoting *Jackman*, 728 F.3d at 805. The harassing "conduct must be extreme" and "[m]ore than a few isolated incidents are required, and the harassment must be so intimidating, offensive, or hostile that it poisoned the work environment." *Tuggle v. Mangan*, 348 F.3d 714, 720 (8th Cir. 2003). Here, Lissick alleges that he reported sexual text messages that he did not personally receive. The record reflects that Andersen addressed Lissick's

report by identifying who sent them and by prohibiting that person from continuing to work at Andersen. Lissick also alleges that he was offended by being called "Lipstick". The Court recognizes that name-calling is unprofessional and unkind, however, in this circumstance, it fails to clear the high threshold necessary satisfy a claim of hostile work environment. The record reflects that within days of Lissick's report, Andersen investigated who used the name, and ultimately disciplined that person for continued use of derogatory nicknames. Accordingly, the Court finds that Lissick fails to establish a *prima facie* claim of hostile work environment under the MHRA.

As set forth above, Lissick's MHRA claims fail nonetheless because there is nothing in the record to suggest that Andersen's proffered reason for terminating Lissick was pretext for sexual harassment or retaliation. Viewing the evidence in the light most favorable to Lissick, the Court finds that there is nothing to suggest that Andersen terminated Lissick for anything other than its reasonable belief that Lissick failed to comply with its LOTO procedures. Accordingly, the Court finds that Lissick's MHRA claims fail as a matter of law.

### 3. FMLA Retaliation

The FMLA provides eligible employees with up to twelve weeks of unpaid leave during any twelve month period if they have a serious health condition that makes them unable to perform the functions of their position. 29 U.S.C. § 2615(a)(1)(D). The FMLA prohibits employers from discriminating against employees for exercising rights under the FMLA. 29 U.S.C. § 2615(a)(2). "This prohibition necessarily includes consideration of an employee's use of FMLA leave as a negative factor in an employment action."

*Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002). "Basing an adverse employment action on employee's use of leave, or in other words, retaliation for exercise of [FMLA] rights, is therefore actionable." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006) (citing *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002)).

To succeed on a claim for retaliation under the FMLA, Lissick must show that he suffered an adverse employment action because he exercised his FMLA rights. *See Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002). There are two ways to prove an FMLA retaliation claim: through direct evidence, or under the *McDonnell Douglas* burden shifting test. "Direct evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Griffith v. City of Des Moines,* 387 F.3d 733, 736 (8th Cir. 2004) (internal quotation omitted). "[D]irect" refers to the causal strength of the proof." *Id.* "A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three part *McDonnell Douglas* analysis." *Id.* The record does not reflect direct evidence of FMLA retaliation. Accordingly, the Court applies the *McDonnell Douglas* analysis.

Andersen contends Lissick cannot establish a *prima facie* case because he cannot show a causal connection between his termination and taking FMLA leave. (Lissick Memo. at 25.) Specifically, Andersen argues that the nine-month interval between when Lissick requested FMLA leave and when Lissick was terminated does not support an inference of a causal link. (*Id.*) Andersen argues further that Lissick's second and third

LOTO violations in October 2017 and January 2018 constitute intervening events that break any alleged casual connection.  (*Id.*)

Lissick reiterates his theory of cat's paw liability to claim that Fitzmorris was ultimately responsible for the decision to terminate Lissick, and that he did so to retaliate against Lissick for exercising his right to FMLA leave.  (*See* Lissick Opp. at 45.)  Lissick argues that because he took FMLA leave in August, September, and October of 2017, "[t]he timing of Lissick's last leave and the fact that he was still on intermittent leave indicates that the timing of the protected conduct and the adverse action are very suspect."  (*Id.*)

The Court disagrees.  The date used to determine temporal proximity is the date "the employer had knowledge of the protected activity."  *Bloom v. Group Health Plan, Inc.*, 2015 WL 3955668, at 4 (D. Minn. Aug. 13, 2014); *see also Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012) (The court "looks to the date an employer knew of an employee's use (or planned use) of FMLA leave, not the date it ended.")  The record reflects that Lissick requested FMLA in April of 2017.  The Court finds that a nine-month interval between Lissick's requested leave and his termination does not support a causal link.  *Bloom*, 2017 WL 3955668, at 4 ("As a matter of law, a six month gap between protected activity and termination cannot support an inference of causation.").  Viewing the evidence in the light most favorable to Lissick, the Court finds that Lissick fails to a establish a *prima facie* case of FMLA retaliation.

As set forth above, Lissick's FMLA claim fails nonetheless because there is nothing in the record to suggest that Andersen's proffered reason for terminating Lissick

was pretext for unlawful retaliation. "An employee who requests FMLA leave has no greater protection against termination for reasons unrelated to FMLA than [he] did before taking the leave." *Estrada v. Cypress Semiconductor (Minn.) Inc.*, 616 F.3d 866, 871 (8th Cir. 2010). Again, viewing the evidence in the light most favorable to Lissick, the Court finds that there is nothing to suggest that Andersen terminated Lissick for anything other than its reasonable belief that he failed to comply with its LOTO procedures. Accordingly, the Court finds that Lissick's FMLA claim fails as a matter of law.

### 4.    Age Discrimination in Violation of Minn. Stat. § 181.81

Lissick asserts that "Andersen does not have a sign in a clearly visible place, written or otherwise, from the Commissioner of Labor and Industry stating that mandatory age for retirement is 70." ("Lissick Opp. at 52.) It is not clear how Lissick was personally damaged by Andersen's failure to post the sign. Notwithstanding, the record reflects that Andersen does not have a mandatory retirement age. Accordingly, the Court finds that Lissick's age discrimination claim fails as a matter of law.

### CONCLUSION

Viewing the record in the light most favorable to Lissick, the Court finds that Lissick has failed to establish a *prima facie* showing for any of his claims. Furthermore, the Court finds that Lissick fails to present sufficient evidence to raise a genuine question of fact that Andersen's proffered reason for terminating Lissick was a pretext for any type of retaliation or discrimination. Therefore, the Court grants Andersen's motion for summary judgment.

**ORDER**

Based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS HEREBY ORDERED** that Andersen's Motion for Summary Judgment (Doc. No. [17]) is **GRANTED**.  Lissick's complaint (Doc. No. [1-1]) is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated:  November 26, 2019          s/Donovan W. Frank
                                   DONOVAN W. FRANK
                                   United States District Judge